Good morning, Your Honors. Good morning. I'm Jonathan Yeasting on behalf of Donnell Turman, the defendant in this case. Jonathan Yeasting, Y-E-A-S-T-I-N-G. It's in the briefs. Proceed. If Your Honors will recall, Mr. Turman was convicted of criminal sexual assault on the theory that the complainant was too drunk to consent after a night of drinking at a party. The briefs raised several issues. I'd like to focus on a few of those today. In particular, I'm going to look at Issue 1, the sufficiency of the evidence claim. Issue 3, the jury instruction issue regarding the freedom of the defendant's statement. And the issue raised in the supplemental brief, if we have time to deal with it, which is the propriety of imposing a life term or indeterminate term of MSR without any court intervention. As a matter of housekeeping counsel, you filed a motion just this week, and leave to file the motion was granted that motion will be taken with the case. Yes, Your Honor. Thank you, Your Honor. Your Honors, speculation and conjecture is not enough to have proof beyond a reasonable doubt. In this case, the record just leaves us to guess at what happened in that apartment that night. And we're guessing at this inherently murky question of whether the complainant had capacity to consent some hours after drinking, and whether Denel, a 17-year-old at the time, would have actually known about it. We have almost nothing from the State as to what happens between about 2.30 in the morning when they get to that apartment and about 6 a.m. when the defendant's brother and his friend show up. What we do have is the only statement we have from the State is the complainant's sudden statement at trial that Denel was on top of me being forceful. The very next sentence after that, she denies remembering any sex act at all. It's fairly remarkable because this is not the kind of statement that a reasonable jury could find credible. At a very first statement at the hospital, she speaks to the nurse. She tells the nurse she only has any belief that there was any sexual intercourse because she's putting together pieces. Mr. Easton, the defendant left a note for the victim. And the theme in the note was that he felt that it was, quote, the alcohol. Does that suggest that he knew that the victim couldn't consent and that it was, quote, the alcohol that was causing her to behave as she did? It suggests that he knew the victim was drunk. It doesn't suggest that he knew the victim wasn't capacitated. In fact, you know, under one of the State's theories of this trial, that the victim was, in fact, unconscious, it plainly rebutts it because why would one leave a note with his phone number after an act like that? Initially, she didn't remember anything. That's right. And it was weeks later that all of a sudden she's saying he forced himself on me. It's years later, as a matter of fact, Your Honor. Had he not left the note, she wouldn't even know who the person was. By her own testimony, had she not left the note, she would not have concluded that anything had happened at all. He even gave her his phone number in the note. Gave her his phone number and asked her to call him. Does that bespeak of a person who's a rapist as opposed to someone engaged in consensual sex with someone? It plainly rebutts any inference of guilty knowledge. I mean, certainly this is not the kind of thing one does after a forced sexual assault, which was what her sudden testimony at trial suggested happened, despite all her prior inconsistent statements leaving out that she remembered anything that happened in the apartment. However, the jury obviously felt otherwise. Because they determined reasonable doubt. We know that the jury convicted. But, Your Honor, they can only convict based on rational inferences, and they just did not have enough information as to what happened in that gap between 230 and 6. Can I ask you what showed up in the results from the rape kit? From the rape kit, there was a semen sample. Right. But there was also not evidence of force. There was no evidence of vaginal trauma. But wasn't there DNA found both? Yes, and I believe there's also testimony, you know, the common drippage testimony on DNA can move. There's a reason that the State declined to charge and pursue an anal sex theory in this case. But wasn't there evidence that there was DNA found? There was some evidence of rectal DNA, but it was a very small sample. But there was some evidence of it. There was some evidence of it, yes. And wasn't his testimony at trial he denied any anal sex? Yes. Thank you. The jury came back asking the court for further explanation as to reasonable doubt. Yes, Your Honor. And the court sent a note back where orally instructed, reasonable doubt is not defined under Illinois law. It is for the jury to collectively determine what reasonable doubt is. Yes, Your Honor, and we argue based on that. What's your comment on that? We argue based on Sullivan v. Louisiana and Victor v. Nebraska, that by telling the jury that it was free for them to determine what reasonable doubt was, it effectively unmoored the standard from what is constitutionally required. In Illinois, we've long held that reasonable doubt is self-defining. We can spell out that self-definition by the kind of instruction that the Defendant's Counsel asked for, that a reasonable doubt is a doubt which is reasonable. The court, though, did something else. It said, okay, jury, now you are free to make up what reasonable doubt is. This was the very last words the jury heard about the nature of reasonable doubt when they were plainly already confused. And once they heard those words, it was not long after that that they convicted. Counsel, is there an IPI defining reasonable doubt? No, Your Honor. We don't give a definition in Illinois. And we don't give a definition because we think such definitions, when we give an elaborate definition, that is confusing. Here, though, once the jury asked the question, I think the court, had it simply refused to give any further instruction on it, that would have been a proper response. But the court here did give further instruction. It gave an instruction which effectively told the jury, reasonable doubt is whatever you think it is. You are now completely unmoored from the plain language. Well, the troubling language is the court saying it is for the jury to collectively determine what reasonable doubt is. Now, does that phrase erode our correct concept and understanding of what reasonable doubt is to the jury? It does, Your Honor. Why? First, Your Honor, because we have certainly there is empirical evidence when jurors are free to go beyond like a specific clear standard, that they will end up doing something less than the abiding conviction, less than those standards the United States has required in Winship. And this is where I think the Third Circuit's Hernandez case is very suggestive. After hearing that instruction, could a juror reasonably conclude that they could convict if they thought the defendant was probably guilty? Yes. In fact, the empirical evidence that's cited in the opening brief says that's exactly what jurors do. They end up falling back to like a preponderance standard when they do so, especially when you have an emotionally charged case like this where it's a sexual assault case involving a he said, she said, and frankly a young black man accused of a crime that happened in the loop. This is the kind of case that's going to bring out those juror prejudices to the worst. Counsel, didn't the trial court say it's not a term defined by Illinois law? That's correct. Right. And so you make the leap that because the court said that, they're going to disregard the plain language? My argument is premised on the notion that when the court said it's for you to determine what a reasonable doubt is, what reasonable doubt is, that moved it away from the plain language. Had it given the defense counsel's instruction, which kept it toward that plain language of the term, that would at least be consistent with longstanding Illinois rule that it was self-defining. And for the honors, this is a closely balanced case. This is the kind of case where a jury instruction error, preserved or not, is decisive. I'd now like to talk briefly about issue three in the briefs, which is the court's failure to properly instruct the jury on how to deal with a defendant's statement. Before you leave reasonable doubt counsel. Yes. The defense offered a version that he wanted the court to give, which was proposed reasonable doubt is not specifically defined under Illinois law. It is not any doubt, only that which is reasonable. The court rejected that and said reasonable doubt is not defined under Illinois law. It is for the jury to collectively determine what reasonable doubt is. Tell me what's so different between what the defense offered and what the judge actually gave. The first one, Your Honor, is a tautology which spells out how reasonable doubt is self-defining. Reasonable doubt is a doubt which is reasonable. It confines the jury's evaluation of the plain language. The second one simply says, we don't know. It's up to you, jury, to determine it. And like the instruction that the Third Circuit dealt with in that Hernandez case, it leaves the jurors unmoored from any objective standard. But didn't Hernandez go way beyond that? What the court in Hernandez told the jury the definition was? What do you feel in your heart and your soul or some other language like that? Yeah, there's some things in Hernandez that are more severe. But in this case also, this is the – in Hernandez, that was actually a statement by the court in voir dire. Here, this was the very last thing that the jurors heard about the nature of the reasonable doubt standard after clearly being confused, after, you know, never being asked initially whether they understood the concept of reasonable doubt. And what do they have? They have, okay, we give up. It's for you to determine what this is. And this question came out of the jury after they were deliberating for a certain amount of time. They had been deliberating, I believe, about five hours. They had asked a few questions about facts and for a variety of transcripts. But I believe this was the first and only specific legal question to come out of the jury. To convict a preponderance of the evidence would not be enough, would it? No, Your Honor. It certainly would not be enough. A juror hearing the instruction that the court gave to them, could they very well have concluded that, well, the preponderance of evidence is against this defendant, so we're going to convict? The unrebutted empirical evidence says that it is probable that's exactly what they did, Your Honor. And if they decided that reasonable doubt means I can judge based on whether I like the defendant's appearance, they could have done that as well when it was solely up to them to determine what reasonable doubt was. Even more broadly, Your Honor, it gives us a huge signal to the jury that they're free to make their evaluations completely unmoored from the law. Your Honor, on the question of the defendant's statement, it's fairly clear here. The IPI has mandated cases when the defendant takes the stand and says, I didn't say that. Counsel argued that he should get the proper instruction. The State falls back on this position that the error was cured by the giving of the prior inconsistent statement instruction. It's far too attenuated a leap to think that that was enough to cure the error. Realize that what we're talking about here is what the State thought was the best evidence of Donnell's mens rea. The key line in the statement that Donnell denied saying was that he states that while having sex with a complainant, he knew she was so intoxicated it was like zombie-like. The State capitalized on that phrase in closing arguments, repeating the phrase zombie-like at least twice. And to think that this is cured by the prior inconsistent statement instructions, the jury would have had to look at the defendant's statement instructions, the one that was specific to the defendant, ignore it, turn past it, go to the prior inconsistent statement instructions, determine that Donnell qualified as a witness even though he was a defendant and there's a more specific instruction there to deal with him, make all the reasoning past that first lengthy paragraph of the prior inconsistent statements, determine that Donnell's statements, all of his statements in interrogation were in fact inconsistent when a lot of it simply echoed his testimony except for these key lines that he denied. Then... Counsel, the key evidence offered by the State to prove this person's, to prove the defendant's guilt was his own statement, his statement, his written statement... Yes, Your Honor. ...as well as the, I guess, the evidence from the rape kit. But it was mainly his own statement, wasn't it? Yes, there's no dispute of the fact of sexual intercourse here. And that statement was in fact, you know, the State's arguments in closing was Donnell's knowledge was all over that written statement. And given the importance of that, it's in this kind of closely balanced case that's in fact less than a he said, she said, which she doesn't remember very much properly instructing a jury on how to deal with that statement at its utmost importance. Counsel, could you talk briefly about your last issue, the MSR issue? Yes, Your Honor. Our position is that the case should, if this court affirms a conviction, the case should go back to the trial court to set a determinate term of MSR, i.e., the court can pick three or five or ten or some specific numbers a year so we know how long my client's going to be in custody for. That's what the statute says. The State's reading, the reading that Schneider gave, somehow decided that the word range in this statute means something different than the word range in every other statute. There really is a split. I mean, the State has a point because they do have an appellate court opinion that says that their position is valid. Yes. I mean, you also have a point. There is a split of authority. I mean, it's not as if yours is the be-all and there's this, the second district says one thing and the fourth district says something else. There is a clear split of authority right now, Your Honor. I'd suggest that Schneider just committed basic errors of statutory construction. It decided that the statute was ambiguous. We think the word range is clear. It means the same as the rest of the code. But once you decide, like the second district did, that the statute's ambiguous, that ends the inquiry. This is an ambiguous sentencing statute. Basic principles of legality say that we should not be, you know, imposing lifetime custody on a 17-year-old based on a law that is so unclear that neither the judge below, nor the state below, nor the defense counsel below thought there was any possibility of a life sentence here. Then even more bizarre than what Schneider did is it found it ambiguous and then decided to read it in a way that creates a contradiction within the code. That very same section of the code starts out talking about how, like, every sentence in Illinois is a determinate term, except for when it's specified in the statute defining the offense. Then to read only two sections later that we suddenly have the only indeterminate term in the code of corrections today based on the word shall range, it breaks the basic doctrines of empire material, Your Honor. Your Honor, I'd like to save about one minute of my time for rebuttal. Given the closeness of this case, I ask you to reverse. He's in custody currently. He is in custody. How long has he served?  How long has he served? I'm doing the math. My head, I believe, is in custody from the 2007 trial onward. So since summer of 2007, but I don't know the precise date. Thank you. May it please this Court, my name is John Walters, and I represent the people of the state of Illinois in the matter before you. With respect to the reasonable doubt issue, there was substantial evidence in this case that this victim was unable to knowingly consent to sex in this case. The evidence actually demonstrated quite powerfully that this victim was suffering some form of alcohol, acute alcohol poisoning. Counsel, does the weight of the state's evidence regarding the fact that the victim didn't or couldn't consent depend entirely on the presumption that defendant knew that she couldn't consent? I mean, do you have to prove that the defendant knew that she couldn't consent in order for you? There is a mens rea element, and that is that the defendant knew. No, does the state have to prove that the defendant knew that she couldn't consent? Yes. Did the state prove that? Yes. And if so, how? Tell me how you proved that. Number one, from the victim's condition herself. The victim was, there was powerful evidence that she was acutely suffering alcohol poisoning in this case. Her eyes were rolling back. She was beyond just passed out. She was, her mouth was open. She was making disturbing noises and moaning. Okay. How does that square with her testimony at trial that she sat up suddenly and said, no, stop, and tried to push him off of her? I refer you exactly to the Fisher case, which is exactly on point, that I cited in my brief. And in the Fisher case. Tell me about this case, though. Well, both cases the same thing happened. And what I would submit to you is that it is plausible, therefore, that even though a victim is unconscious, that in the midst of a powerful sexual assault, that the victim could be roused to a moment, a brief moment of consciousness before falling back into unconsciousness. This is exactly what happened in Fisher. It's what happened in this case. Okay. And how does the state prove that this 17-year-old who turned 17 the month before this happened, how did you prove to the jury that he would have known that, that there is the Fisher case said that you can go back and forth between ability to consent and inability. You have to prove that he had the capacity to know that. How did you do that under these facts? That's what I'd like you to explain for me. Well, keep in mind, this was a very brief moment in time that she's roused to consciousness. So the time up until that, she's in this state. She's having seizures in the car ride over. He's left basically to watch over her because she's in this awful state. So he's well aware of her condition. He's attacking her, and it's on the point of attacking her that she's roused briefly and that she falls back into unconsciousness. Where she stays, the remainder. I know the facts. I'm asking you to tell me how do you prove that under these facts, this defendant had the conscious knowledge that the victim had the capacity, didn't have the capacity to consent given the fact that she claimed that she said no at one point and tried to push him off. Wouldn't that suggest that there is some recognition of reality of what's going on around you? In that brief moment of time. In addition to her physical condition, which is clearly some form of alcohol poisoning, look at what he does right afterward. He writes this note. And this note is a way of sort of catching her up on what she's missed. That's a clear indication that he knows that she wasn't there. She was not conscious. Well, that's not what they say. Their argument is that the note cuts the other way. The note basically acknowledged what both of them consented to. That's their argument. So, I mean, I think the note, it certainly can cut both ways. I understand your argument, but theirs is the opposite. Let me attack the notion, though, that the note really supports the defense in this case. Look at sort of the self-serving elements that are both in the note and in the written statement. In the note and in the written statement both is this theme that the idea to have sex was her idea. But I want you to take a step back. This party started out, this party started out and was entirely populated by Illinois Art Institute students, entirely. There's nobody there that isn't an Art Institute student. Then Defendant and his brother show up. Defendant's brother at least has some relationship to one of the students, David Nelson, who's a friend of the victim's and a very important witness also as to the victim's condition before and after the assault. Defendant, why is he at this party? He's 17 years old. He's a high school dropout. Now apparently he's at some stage of working on his GED at this point in time. But he's a high school dropout. Amongst all these college kids, they're all from the same place. Is he there to discuss Henri Matisse or Salvador Dali? Why is he there? The jury knew why he was there. Look at the statement that he was there on a mission to have sex with this victim. That's why he was there. Look at the statement that David Nelson makes to Defendant as he leaves the room with this Defendant. He says to her, look, don't have sex with that victim because she's too drunk and intoxicated. Now, that's a very odd thing to say to another human being unless you have some inkling that that human being, that other human being, has some idea in their head that they want to have sex with somebody who's drunk and intoxicated. That's a very telling point. It's not the only point either. I said that there were points that the Defendant inserted into both of these things. Can I ask you something else? Because I'm still concerned about this, the fact that the State, and you've agreed that the State had to prove that the Defendant knew that this victim was unable to consent in order for the State to make its case. Did the State put on any expert testimony or think about doing something like that to show how long the alcohol would have an effect? I mean, other than showing that she was really drunk, which clearly that was established, what else did the State do to show that this Defendant either knew or should have known that this victim could not consent? What testimony and evidence did the State put on? Because that's the crux of your case. I mean, if he didn't know that she couldn't consent and he's testifying that she initiated it, you don't have a case unless you can prove that he's making that up. So tell me what you did. What did the State do to prove that he knew that she couldn't consent? In addition to the Defendant's statement, and in addition to the victim's clearly being essentially suffering from alcohol poisoning, you have the testimony of David Nelson in this case. And his testimony is quite interesting in this. And you also have the victim's testimony. I want to get to that in a minute. But David Nelson testifies to the victim's condition both before and after the assault. And what he testifies to is that they come to collect the Defendant at approximately 5 o'clock. So it's roughly two hours or so that the Defendant has been with the victim alone. And that, incidentally, is why the Defendant didn't have any qualms about writing his name and his phone number. Everyone knew he was in the apartment with the victim. So it's not as if he was hiding something by writing his name and his phone number. It's really quite telling, actually, in that note, that he felt it necessarily to describe himself to the degree that he did. He didn't just sign his name on that note. So there is guilty knowledge in the note. But let me get back to David Nelson. So assuming all of that is true, how does that square with your theory that she was so drunk that she wouldn't have known, and had he not said anything, she would never have known that he had sex with her? I mean, those two theories are not consistent. Well, look at the facts of this case. She wakes up, her clothes are in disarray. You can say that she wouldn't have known anything, but there was DNA taken in this case, there was semen taken in this case. Yeah, because of the note. In part because of the note. But she wakes up, and the first thing she does is she goes to her friend David Nelson and she says, what happened? So even though she's in possession of the note. All of that is because of the note. Wasn't that her testimony that she said the note spurred her to go and find out what had occurred? But for the note, she would not have known, at least that's what she initially said, she would not have known that anything happened. Isn't that right? The note spurred her, but even in the absence of the note, she still would have found herself in disarray. And she knew she had been at that party with David Nelson. She still would have gone to David and said, what happened? But then weeks later she then says, oh, I was forced. Years later. Years later. Doesn't that bespeak more of regretted sex than refused sex? No, because you have to look at the medical records in this case, because they actually corroborate what the victim is saying. There's no question they had intercourse. There's no question of that. So what does the medical evidence show? They had intercourse? It shows injuries. It shows some injuries. What injuries? How did they abuse her? She had tenderness and a bruise to her thigh, and she had tenderness to her upper breast. This was testified to by the registered nurse, the nurse from the ER over at Northwestern Memorial Hospital, Nurse Rivera. She testified that, yes, there was questions about whether there was damage to her organs. There was also testimony that there was no evidence of trauma to her genitals. Right. That's true. That's true. But there was a soreness and bruising to her thigh, which is quite telling, and to her upper chest. She didn't sprain her wrist from falling. She didn't gash her head from falling. She didn't stub her elbows or her knees. She was injured in her thigh and in her upper chest, which actually corroborates her later recall that she had this moment where she did have a moment of consciousness, just as the victim and Fisher did. Counsel, let's talk about the later recall, because while we give great deference to the prior fact, as an appellate court, we also have an obligation to look at what's reasonable and what actually makes sense. This victim told the nurse she had no recollection. She told three detectives she had no recollection. Two years later at court, she remembers sitting up and saying no, but nothing else about that night. Does that strike you as odd? No, it's not at all implausible, because a combination of trauma and alcohol poisoning can impede recall. It's absolutely not implausible. And in this particular case, years down the road after the effects of the trauma had dissipated, after the effects of the alcohol had dissipated, remember she makes these statements within a week. These statements that we're talking about that were inconsistent, they were made within a week of the sexual assault. She was still very much suffering from the trauma and from the after effects of the alcohol at that point. Years later, she had a chance to recollect. In this type of case, when it's one-on-one, and we've already discussed a myriad of questions here that could be decided either way, in such a case, isn't it important that we have a competent jury that's properly instructed as to the burden of proof upon the state to prove guilt beyond a reasonable doubt? So you're addressing the second issue? Isn't this such a case where the jury should really be instructed properly on reasonable doubt? And, Your Honor, the answer is that this jury was properly instructed in this case. But actually, the instruction initially proffered by the defense was an improper instruction, because it attempted to qualify what reasonable doubt was. I would point out that the defense counsel in this case didn't just offer tautology. Tautology would be a circular definition like reasonable doubt is reasonable doubt. Our inquiry is what the jury was instructed, not what was offered initially, not what was hammered out otherwise in conference, but what was that jury instructed. And when you have a court saying that reasonable doubt is for you to collectively determine on your own, hasn't there been a departure of a proper instruction to the court? Doesn't that instruction erode what due process requires in instructing a jury as to reasonable doubt? No, Your Honor, and I would respectfully request that you really look at the cases that I cited in my brief. I point to you particularly the Phaler case, F-A-I-L-O-R. It was exactly the same response was given in that case that was held to be proper. In fact, there were a number of other cases that I cited in my brief, not just Phaler. There were other cases where prosecutors made similar arguments. It's for you, the jury, to decide what reasonable doubt is. And it has always, in Illinois, it's always been held to be proper. Defendant doesn't cite to you a single Illinois case to the contrary. All the law is on my side on this issue. The law in Illinois is quite clear that that particular direction to the jury was a proper direction. The case that he cites from the Third Circuit, besides being factually distinct, and even he had to admit that there were some more severe things said in that case, in the Third Circuit they have a different view of reasonable doubt than the Illinois Supreme Court does and the Illinois Appellate Court does. And the law in Illinois is that, I think it's beautifully described at one point, in one of the cases they say, to give a further definition of reasonable doubt is to provide further elaboration of language without amplification of the idea. I think that's a lovely way of putting it. No, in Illinois there is no IPI instruction, as Justice Connors pointed out earlier. There's no IPI instruction. So what does that tell us? That in every single case in the state of Illinois, whether it's a misdemeanor case, a traffic court case, a felony case, all throughout the state, every county, we trust the jury in every single case to make the determination of what reasonable doubt means. Now I want to point something else out too. Because defendants says, oh well the jury might sort of look to a default like preponderance or something like that. That was specifically addressed in this case. The trial court, before trial, actually told the jury, there's a different standard in civil cases called preponderance of the evidence. And that is not the standard that applies to this case. And my recollection is it's supplemental record, page 45, that you'll find that. The judge actually directs the jury, this is not a preponderance situation. This is a reasonable doubt situation. Good memory. Trying to do the best I can to serve you. Could you address the MSR issue? The MSR issue. Just take a moment. I'm sorry, my recollection of strings of numbers isn't as good as it used to be. There are a number of statutes that were enacted along with this particular statute, 581D4. They were all part of Public Act, and I'm sorry, I'm going to have to look at this. Public Act 94-165, this is also House Bill 2386. And I submitted some of the legislative history as an appendix to the back of my brief. So those numbers and that information is here. And I also submitted, this was a project actually of the Illinois Attorney General. And it's described quite well by the witness that the Attorney General sent to testify both before the House Judiciary Committee and the Senate Judiciary Committee in the General Assembly. And the idea was that we're going to treat MSR and we're talking strictly about parole. We're not talking about somebody who's in custody. We're talking about supervising people that are out on the street. And the notion here is that we're going to have extended supervision and that you see that actually reflected in the plain language of the statute. And it's reflected in a couple of the, I said there were several statutes that were enacted at the same time. Those are 332A 3.5, I apologize for having to read these, but 314 2.5 of the code. There is Illinois case law that says the defendant has a right, an absolute right to know with certainty what their sentence is. How does that square with your position that it's okay to leave the MSR up to the discretion of the DOC? Well, I think a couple of things. One, looking at the statute itself under the Code of Corrections, what needs to be imposed? Definitely we've gone to determinate sentencing, but the statute itself doesn't say determinate sentencing for imprisonment and parole. It just says the sentence of imprisonment has to be a determinate sentence unless the statute defining the offense describes otherwise. So in this particular situation, the statute itself requires a determinate sentence only for a sentence of imprisonment, the actual custody time that's being served in Department of Corrections. We look at the statute, though. We look at these sister statutes that I mentioned, and these are important because they look at what do we want to do when we're supervising convicted sex offenders once they're released back out to the general public? What are the things that the General Assembly wanted to see happen before they were completely released from that supervision? And two of those things are that there needed to be a recommendation from the parole officer and a sex offender evaluation that that could terminate. So there's clearly, the General Assembly wasn't interested in a mere arbitrary passage of years to go by, to say we're going to have supervision of this person for 3 years or 8 years or 12 years. The defense argument is that the court is required to set a term and the Department of Corrections can recommend that that term be shortened, but the Department of Corrections is not empowered to set the term. That's what their argument is, as I understand it. Let me take a step back because there's a part of this that I actually agree with, and I think this part of it actually helps explain why there's a difference between Reinhart on the one hand and Schneider on the other. In Schneider, the court imposed an indeterminate MSR period and the court affirmed. In Reinhart, the question wasn't that. The question was that the trial court, just like in this case, had failed to impose a period of MSR and the DOC sort of took it upon itself maybe to try and define all on its own to essentially impose that term of MSR. And I would agree that DOC cannot impose, it is not the legal authority to impose a term of MSR. That has to be, mandatorily has to be imposed by the trial court. But that, as Schneider said, once the trial court imposes that sentence, or that disposition, that MSR disposition, the trial court can choose, in this particular circumstance with sex offenders, an indeterminate period. Why? Look at things like the Sexually Dangerous Persons Act or the Sexually Violent Persons Act. You've got the same, I just want to finish this one point. Both of those acts treat sex offenders the same way. They look at releasing sex offenders in those two acts from actual custody based on their ability to be returned to society. So in both of those situations, it's an indeterminate length of custody. This isn't even custody, but it follows the same idea that the General Assembly has, that the people of the state of Illinois have, for supervising sex offenders until such point as they've demonstrated that they're no longer a risk to the community. Colleague Counsel, you're saying that in every criminal case, an MSR has to be established by the trial court, unless it's a sex case, and they don't have to put a definite term on it. Right, but the trial court does have to put it in the minimus, and the trial court didn't actually do that in this particular case. Didn't do it in the Reinhart case either, and I think that goes some ways to explaining what happened in Reinhart. I think that was the real issue. If you look at Reinhart, that was the real issue that was presented in Reinhart. The DOC doesn't have that authority all of its own to impose MSR. With that, people respectfully request that this Court affirm defendant's conviction. Thank you. Thank you. Mr. Easton, brief response, please. Emphasis on brief. First Your Honor, I suggest you take the State's suggestion, look at the medical testimony at trial. The trauma is a single bruise on the outside of the leg. Given that she was kneeling in front of a toilet for something like the time, and carried to a bathtub, that's no surprise. The medical testimony is certainly not testimony of alcohol poisoning. She's at the hospital the day after saying that she was very drunk. She's not giving any kind of liver treatment or anything like that. She's merely given a little bit of water. And had we had some expert testimony, this might be a different case. We have none, and the State didn't meet its burden. And then very briefly, Your Honors, on the MSR issue, I suggest you do read the Reinhart case. It quite expressly held, despite the State's contention here, that a trial court, the statute requires a trial court to set a determinate term of MSR, just as every other statute that sets a range in the Code of Corrections requires the court to set a determinate term for sentencing. The kind of system that counsel described might make sense, but it's not the kind of system that this legislation sets out. If that's what the legislature wants to do, before we start imposing a life term on a 17-year-old with two sentences of debate in the Senate, then they'll have to go back and put the ball in the legislature's court here. Thank you, Your Honors. Thank you both for a very spirited argument. This case will be taken under advisement. Questions?